**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Donald W. BIEBER, Defendant–Appellant.**

**No. 87CA1863.**

Colorado Court of Appeals, Div. I.

Jan. 30, 1992.

Rehearing Denied March 12, 1992.

Certiorari Granted Aug. 31, 1992.

Gale Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Timothy R. Twining, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Vitek and Doniger, P.C., Anne M. Vitek, Jeffrey D. Doniger, Denver, for defendant-appellant.

Opinion by Judge RULAND.

Defendant, Donald W. Bieber, appeals from judgments entered upon jury verdicts finding him legally sane and convicting him of first degree murder (felony murder), aggravated robbery, and second degree aggravated motor vehicle theft. We affirm.

Between the hours of 3:00 a.m. and 7:00 a.m. on the date of the victim's death, defendant came in contact with various individuals at a truck stop, a convenience store, and a nearby park. To these persons, he indicated a concern about "communists," "cops or commies," and stated that he had "killed a communist on war memorial highway." Also, he sang "God Bless

America" and the "Marine Hymn" on several occasions.

Defendant was armed with rifles and a meat cleaver. He was seen initially driving a bus and then later the victim's pickup truck. Police were contacted when the defendant backed the pickup truck into a fence at one of the convenience stores and then left the scene.

The victim's body was located at approximately 6:00 a.m. and defendant was arrested at approximately 8:00 a.m. The victim and defendant were not acquainted, and the prosecution's evidence indicates that defendant shot the victim at close range for no apparent reason.

Based upon a post-arrest interrogation recorded on videotape, defendant was diagnosed as demonstrating atypical psychotic disorder. The cause of the disorder was described as possibly paranoid schizophrenia or an amphetamine delusional disorder.

An amphetamine delusional disorder is described as consisting of paranoid delusional thinking caused by long-term use of amphetamines which persist beyond the intoxication phase of the amphetamine use. Such a disorder can extend anywhere from two weeks to a year after the date this type of drug is ingested. A psychologist testified at the insanity trial that, because of such disorder, defendant's ability to distinguish right from wrong could have been impaired on the date of the homicide.

The psychiatrist called by the prosecution at the sanity trial conceded that defendant could have suffered from an amphetamine delusional disorder on the date of the homicide and that this disorder could have affected his ability to distinguish right from wrong. This psychiatrist's diagnosis was, however, that defendant suffered from an anti-social personality disorder which excluded the possibility that defendant was suffering from paranoid schizophrenia. In the psychiatrist's opinion, defendant had the ability at the time he shot the victim to distinguish right from wrong.

A urinalysis performed on defendant on the day of the homicide tested positive for long-term excessive marijuana use, but the sample revealed no other controlled substance. A psychiatrist testified that amphetamines can be detected two to five days after ingestion depending upon the dosage. The prosecution and defense counsel stipulated that defendant had not ingested amphetamines for at least two days prior to the homicide.

The record reflects that defendant was a long-time drug user, ingesting numerous illegal substances including amphetamines. Defendant's drug abuse started at age 13. As an adult, his principal source of funds was generated from the sale of illegal drugs.

The record further reflects that defendant had voluntarily entered a hospital several years before this homicide to obtain treatment for mental impairment arising from the effects of substance abuse. At that time, he expressed fear that he might hurt someone. However, apparently his drug psychosis "cleared very rapidly," and he was released with a referral to a long-term drug treatment program.

Following his transfer to the state hospital for evaluation in this case, the psychiatrist noted that defendant's condition improved rapidly even when he was confined in maximum security.

As pertinent here, and consistent with the statutory definition of insanity, the jury was instructed that defendant was not accountable for commission of a crime if he was so diseased or defective in mind at the time the crime was committed that he was incapable of distinguishing right from wrong. The jury was also instructed that: "care should be taken not to confuse such mental disease or defect with moral obliquity, mental depravity ... or other motives, and kindred evil conditions."

With reference to intoxication, the jury was instructed that this term refers to a disturbance of mental or physical capacities resulting from the introduction of any substance into the body and that "intoxication does not, in itself, constitute a mental disease or defect."

I

SANITY TRIAL

Defendant initially contends that the trial court erred during his sanity trial in re-

fusing to instruct the jury on "settled insanity" as set forth in *People v. Kelly*, 10 Cal.3d 565, 111 Cal.Rptr. 171, 516 P.2d 875 (1973). Under the circumstances of this case, we disagree.

## A

The "settled insanity" doctrine has been recognized in various jurisdictions as a form of mental infirmity which absolves an individual of responsibility for the commission of a crime. *See People v. Free*, 94 Ill.2d 378, 69 Ill.Dec. 1, 447 N.E.2d 218 (1983). This doctrine is predicated upon the view that an inability to distinguish between right and wrong because of a mental infirmity derived from excessive substance abuse should be recognized as a form of legal insanity when the mental infirmity persists after the effects of the substance itself have dissipated. *See* Note, *Intoxication as a Criminal Defense*, 55 Colum.L.Rev. 1210 at 1219 (1955); 2 C. Torcia, *Wharton's Criminal Law* § 109 (14th ed. 1979). The instruction tendered by defendant at the sanity trial reflected the precepts of the settled insanity doctrine.

■ Contrary to the prosecution's contention, we conclude that there was sufficient evidence and inferences from evidence here to create a reasonable doubt whether defendant suffered from a form of mental infirmity which qualifies as settled insanity and which would, therefore, warrant giving the tendered instruction.

■ The first issue then is whether this form of mental infirmity excuses a defendant from responsibility for the commission of crime within the statutory scheme adopted by the General Assembly in this state. In my view, it does not.

In 1984, the General Assembly amended the statute defining legal insanity and adopted a strict *M'Naghten* test for resolution of that issue. *See People v. Low*, 732 P.2d 622 (Colo.1987); M. Wesson, *Crimes & Defenses in Colorado* 117 (1989).

■ With reference to substance abuse, specific limitations have been adopted relative to defenses predicated upon the *volun-*

*tary* ingestion of any substance. *See Cordova v. People*, 817 P.2d 66 (Colo.1991); *People v. DelGuidice*, 199 Colo. 41, 606 P.2d 840 (1980). Thus, evidence of voluntary intoxication may be offered to negate the existence of a specific intent if that intent is an element of the crime charged; however, that evidence is incompetent as a defense to general intent crimes. *People v. Low, supra.*

Further, in *Hendershott v. People*, 653 P.2d 385 (1982), our supreme court had occasion to discuss the concepts underlying the public policy of this state pertinent to mental infirmity. With reference to voluntary intoxication, the court stated:

> The concept of self-induced intoxication, by definition, requires that the defendant be aware at the outset that the substance he is about to ingest may affect his mental faculties. *It is a matter of common knowledge that the excessive use of liquor or drugs impairs the perceptual, judgmental and volitional faculties of the user.* Also, because the intoxication must be 'self-induced,' the defendant necessarily must have had the conscious ability to prevent this temporary incapacity from coming into being at all. Self-induced intoxication, therefore, by its very nature involves a degree of moral culpability. *The moral blameworthiness lies in the voluntary impairment of one's mental faculties with knowledge that the resulting condition is a source of potential danger to others. See generally* Model Penal Code § 208, Comment 3 (Tent. Draft No. 9, 1959). It is this blameworthiness that serves as the basis for *DelGuidice's* rule of exclusion. Thus, when a defendant chooses to knowingly introduce intoxicants into his body to the point of becoming temporarily impaired in his powers of perception, judgment and control, the policy enunciated in *DelGuidice* prohibits him from utilizing his intoxication as a defense to crimes requiring the *mens rea* of 'knowingly,' 'willfully,' 'recklessly' or 'with criminal negligence.' There is nothing in *DelGuidice*, however, that is inconsistent with permitting a defendant to contest

these culpability elements by evidence of a mental impairment caused by a known mental disease or defect, or by other evidence of an incapacity *not directly caused by self-induced intoxication.* (emphasis supplied)

Finally, in *People v. Low, supra,* our supreme court had occasion to address the distinction between impaired mental condition and insanity. In that discussion, the court noted:

Temporary insanity is not part of the statutory framework for resolving a defendant's nonresponsibility for a criminal act, and was not a proper ground for the trial court's entry of a judgment of acquittal.

In view of these considerations, I consider the application of the settled insanity doctrine as not being consistent here with the policy underlying our statutory scheme. Instead, because it is common knowledge both that mental infirmity is a by-product of excessive substance abuse and that this infirmity is a source of potential danger to others, I would hold that when this infirmity is directly caused by voluntary intoxication, even though the effects of the substance have dissipated, the defendant is not diseased within the contemplation of the legal insanity statute. This imputation of knowledge concerning the effects of substance abuse is particularly significant as regards defendant here since he had previously sought treatment for mental illness that he recognized as arising from his drug use. *See* § 16–8–101, C.R.S. (1986 Repl. Vol. 8A).

Moreover, as shown by defendant's history in which there were temporary periods of psychosis followed by recovery, adoption of the defense of settled insanity here would have the effect of re-establishing the concept of temporary insanity that has been rejected by the General Assembly. *See People v. Low, supra.*

Accordingly, I find no error in the court's refusal to give the jury instruction proffered by the defendant.

**B**

Defendant contends that the trial court committed reversible error by admitting evidence of a felony conviction and his history of prior drug sales during the sanity trial. We agree with the trial court's resolution of this issue.

■ Generally, evidence of prior criminality of an accused is not admissible. *See* CRE 404(a)(1); *People v. Peterson,* 633 P.2d 1088 (Colo.App.1981). However, in an insanity trial, this rule is relaxed since the prejudice that may occur by the admission of such evidence is lessened by a separate trial on the issue of guilt. *See Trujillo v. People,* 150 Colo. 235, 372 P.2d 86 (1962).

■ Thus, evidence tending to establish that a defendant was sane is admissible even if it implicates prior criminality, unless the probative value of such evidence is substantially outweighed by its prejudicial effect. *See* CRE 403; *People v. Renfrow,* 193 Colo. 131, 564 P.2d 411 (1977). This latter determination is within the sound discretion of the trial court, and that decision will not be overturned absent an abuse of that discretion. *People v. Rubanowitz,* 688 P.2d 231 (Colo.1984).

■ Here, defendant sought to prevent the psychiatrist from testifying about a prior drug conviction. The court reserved its ruling on this issue because the parties agreed to consider the issue at an *in camera* hearing. However, prior to presentation of the psychiatrist's testimony, the prosecutor asked another witness if he was familiar with defendant's statement that defendant had sold drugs his entire life. Defense counsel immediately moved for a mistrial on the basis that the question was against the parties' agreement.

However, even if we assume the prosecutor's question violated the parties' agreement, the violation was not so severe that the drastic remedy of a mistrial was warranted. *See People v. Abbott,* 690 P.2d 1263 (Colo.1984). And, after reviewing this testimony, we conclude that the trial court did not abuse its discretion in admitting it into evidence. *See People v. Renfrow, supra.*

C

Defendant further contends that there is a reasonable probability that he was prejudiced in the sanity trial by the submission to the jury of undisclosed evidence. We find no reversible error.

■ The defendant has a responsibility to check exhibits and to object to the inclusion of evidence not admitted during trial. *See Government of Virgin Islands v. Joseph,* 685 F.2d 857 (3rd Cir.1982); *see also People v. McGrath,* 793 P.2d 664 (Colo. App.1989).

■ If a defendant fails to fulfill this obligation and an exhibit is admitted without objection, we may review such oversight only to determine if plain error occurred. Crim.P. 52(b). A plain error is an error that substantially affects the fundamental fairness of the trial proceedings and casts serious doubt on the reliability of the jury's determination. *Wilson v. People,* 743 P.2d 415 (Colo.1987).

■ After the jury returned its verdict finding that defendant was sane, the prosecution learned that a small plastic bag containing an unidentified white powder was found inside of one of the People's exhibits. This exhibit contained several bags of marijuana that had been seized from defendant's bus. The plastic bag was not separately marked for identification or introduced into evidence.

Apparently, neither the prosecutor nor defense counsel was aware of its presence inside the exhibit. However, in an affidavit submitted to the trial court by a juror, the juror noted the presence of the bag as well as the fact that it had not been admitted.

Defendant argues that these circumstances show prejudicial error because the jury could have inferred that the bag had been seized by the police from defendant's bus and that he was under the influence of amphetamines when he killed the victim. In addition, he asserts that since defense counsel argued several times during closing that there was no evidence presented indicating defendant's use of amphetamines during the period leading up to the homicide, the discovery of the white pow-

der severely undermined counsel's credibility.

Here, there was a stipulation by both parties that defendant had submitted to a drug test on the day of the murder. This test showed that amphetamines were not present in defendant's body. The stipulation, of which the jury was informed, also stated that the test could detect the presence of amphetamines within two to five days of usage, depending upon the amount taken. Thus, under these circumstances, we conclude that the submission of the bag containing the white residue to the jury did not constitute plain error. *See* Crim.P. 52(b).

II

GUILT TRIAL

■ Lastly, defendant contends that, under § 18–1–406(2), C.R.S. (1986 Repl.Vol. 8B), the trial court erred in denying his statutory right to waive a jury trial on the charge of aggravated robbery which was the underlying felony to the felony murder charge. We disagree.

During pre-trial motions, defense counsel stated that defendant wished to announce to the court that he wanted to waive his right to a jury trial on the count of aggravated robbery. Defendant argued that the court could sit as the trier of fact for the aggravated robbery charge, but objected to the court instructing the jury as to its decision for purposes of the felony murder. Such a procedure, defendant argued, would take away his right to have all of the elements of the felony murder charge decided by the jury. Defendant did not seek severance of the counts.

Section 18–1–406(2) provides:

Except as to class 1 felonies, the person accused of a felony or misdemeanor may waive a trial by jury by express written instrument filed of record or by announcement in open court appearing of record.

Our supreme court has held that this statutory right to waive a jury trial is substantive in nature and controls over

Crim.P. 23(a)(5) which requires the prosecutor's consent for a defendant's oral request to waive his right to a jury trial.

Nevertheless, we conclude that any error by the trial court in denying defendant's request was harmless. *See* Crim.P. 52(a).

Since multiple convictions for both aggravated robbery and felony murder are not permitted, the procedure sought by defendant here would have effectively made any determination by the trial court meaningless. *See People v. Raymer*, 626 P.2d 705 (Colo.App.1980), *aff'd*, 662 P.2d 1066 (Colo.1983). Therefore, we conclude that the trial court did not commit prejudicial error in refusing to follow the procedure requested by defendant.

■ We also conclude that remand is not necessary since the trial court properly recognized in the mittimus that the aggravated robbery charge merged with the felony murder. *See People v. Raymer, supra.*

The judgment is affirmed.

TURSI, J., specially concurs.

DUBOFSKY, J., dissents.

Judge TURSI specially concurring.

I specially concur.

■ Although I believe that "settled insanity" can be a disease or defect of mind within the definition of insanity as set out in § 16–8–101, C.R.S. (1986 Repl.Vol. 8A), nevertheless, I believe that here it became an evidentiary question which was fairly arguable to the jury under the instructions as given.

I agree with the dispositional opinion on all other issues addressed and, therefore, concur in the affirmance. However, I would point out that, for guidance of the trial courts, the effect of the three opinions issued in this case is to permit consideration during a sanity trial of "settled insanity" as a form of mental disease or defect if appropriate evidentiary support is presented.

Judge DUBOFSKY dissenting.

I respectfully dissent.

In my view, the trial court committed reversible error in failing to instruct the jury on "settled insanity" consistent with the instruction tendered by defendant at the sanity trial.

In 1847, Lord Hale at 1 Pleas of the Crown CH IV reiterated what was even then, and is certainly now, a well accepted view of the law of insanity. Lord Hale stated that insanity produced only by an ingestion of alcohol near or at the time of the offense was not a defense to a criminal act, whereas insanity resulting from a long-term use of alcohol was a defense.

Most jurisdictions recognize the distinction between insanity caused by an ingestion of alcohol or drugs close to the time of the offense and that resulting from a long-term and remote use of drugs or alcohol. In the former situation, insanity is not available as a defense to the crime, whereas in the latter situation, it is. *See Martin v. State*, 100 Ark. 189, 139 S.W. 1122 (1911); *People v. Kelly*, 10 Cal.3d 565, 111 Cal.Rptr. 171, 516 P.2d 875 (1973); *Griffin v. State*, 96 So.2d 424 (Fla.App. 1957); *State v. Freitas*, 62 Hawaii 17, 608 P.2d 408 (1980); *State v. Clokey*, 83 Idaho 322, 364 P.2d 159 (1961); *People v. Free*, 94 Ill.2d 378, 69 Ill.Dec. 1, 447 N.E.2d 218 (1983); *Parker v. State*, 7 Md.App. 167, 254 A.2d 381 (1969); *Commonwealth v. Ricard*, 355 Mass. 509, 246 N.E.2d 433 (1969); *People v. Cahill*, 320 N.Y.S.2d 487, 36 A.D.2d 746 (N.Y.App.Div.1971); *State v. Wilson*, 104 N.C. 868, 10 S.E. 315 (1889); *Rucker v. State*, 119 Ohio St. 189, 162 N.E. 802 (1928); *Couch v. State*, 375 P.2d 978 (Okla.Crim.1962); *Evilsizer v. State*, 487 S.W.2d 113 (Tex.Crim.App.1972); *Arey v. Peyton*, 209 Va. 370, 164 S.E.2d 691 (1968); *State v. Rio*, 38 Wash.2d 446, 230 P.2d 308 (1951); *State v. Woods*, 169 W.Va. 767, 289 S.E.2d 500 (1982).

Despite the long history and substantial case authority in support of this rule, the dispositional opinion here rejects the distinction between insanity resulting only from the recent ingestion of alcohol or drugs and insanity which results from an earlier long-term use of alcohol or drugs.

For several reasons, I believe this treatment of the issue to be mistaken.

In deciding the issue, the dispositional opinion primarily relies on *Hendershott v. People,* 653 P.2d 385 (Colo.1982); *People v. Low,* 732 P.2d 622 (Colo.1987); and *People v. DelGuidice,* 199 Colo. 41, 606 P.2d 840 (Colo.1979). However, neither in those cases or any other Colorado case was the issue of "settled" insanity resulting from a long-term earlier use of alcohol or drugs at issue.

*People v. DelGuidice, supra,* the earliest of the three cases relied on, involved a defendant attempting to use alcohol intoxication contemporaneous with the offense as a defense to his criminal charges. The primary issue was whether Colorado's statutory prohibition against the use of contemporaneous intoxication as a defense in a criminal case violated the Due Process clauses of the United States and Colorado Constitutions. Although the conviction was affirmed, three members of our supreme court dissented on the basis that the legislative prohibition violated due process. I find those due process concerns important here.

Since the prosecution must prove each element of the offense beyond a reasonable doubt, *see In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), there are significant constitutional issues raised whenever defendants are prohibited from pleading not guilty because they lacked the *mens rea* to commit the offense. For this reason, we should not readily expand the limitations on the criminal defenses beyond those clearly set out by statute and required by holdings of our supreme court.

The dispositional opinion here quotes extensively from *Hendershott v. People, supra.* However, the *Hendershott* majority determined that it would violate the Due Process clauses of the United States and Colorado Constitutions to prohibit a defense of brain injury which limited defendant's mental capacity to form the necessary *mens rea* for the offense.

In that ruling, the *Hendershott* court contrasted the brain injury defense of the defendant with a person who was claiming an intoxication/insanity defense because of voluntary ingestion of alcohol. But, the defendant there did not claim that his brain injury resulted from either contemporaneous or long-term use of alcohol or drugs, and thus, the court's discussion of alcoholism was not central to its decision. Moreover, there is no indication in *Hendershott* that the court's discussion about voluntary intoxication included a prior long-term and settled use of drugs or alcohol.

In my view, the acceptance in *Hendershott v. People, supra,* of the concept that the defense of brain injury contrasted to intoxication from recent ingestion of alcohol or drugs must be permitted under the constitution supports the admissibility of the settled insanity defense here.

Implicit in the settled insanity defense is the notion that defendant's brain has been altered by the long-term use of alcohol or drugs. *See State v. Booth,* 169 N.W.2d 869 (Iowa 1969); *Parker v. State, supra.* Such changes in the brain may make it organically different, or abnormal, on a long-term or settled basis. *See, e.g.,* J. Rankin, *Alcohol, Drugs and Brain Damage* (S. Lamberd ed. 1975).

In contrast, a person who claims he lacks the requisite *mens rea* to commit the charged offense because of ingestion of alcohol or drugs at or near the time of the offense does not have an injury of the type recognized in *Hendershott.* Indeed, the immediate or proximate cause of the defendant's actions in the settled insanity situation is more closely akin to the brain injury in *Hendershott,* rather than to the recently consumed alcohol situation in *People v. DelGuidice, supra. See also State v. Booth, supra; Parker v. State, supra; People v. Free, supra.*

The dispositional opinion also relies on the language in *People v. Low, supra,* that temporary insanity is not a defense to a crime in Colorado. *Low* involved the correctness of a trial court's ruling that defendant was not guilty by reason of insanity because of his recent ingestion of numerous cough drops which contained the drug dextromethorphan hydrobromide. But, since the ingestion of the cough drops in

*Low* was very close in time to the offenses, the settled insanity issue was not before the court.

In my view, the terms "temporary" and "permanent" insanity in the alcohol/drug context can be misleading. The courts have referred to the action of a defendant through the ingestion of these items as being "temporary insanity," whereas the delayed reaction to a long-term prior use of alcohol is called "settled or permanent insanity." *Parker v. State, supra; People v. Kelly, supra.*

Since the extent of the period of manifest insanity may be of equivalent length in either the "temporary" or "permanent" situation, the distinction depends on when the drugs or alcohol were ingested in time relationship to the criminal offense.

The court in *Parker v. State, supra,* discussed the difficult analytical problem the courts have had with the use of these terms. It stated:

> Regardless of what test is applicable to determining insanity, the majority [of courts] distinguish between (1) the mental effect of voluntary intoxication which is the immediate result of a particular alcoholic bout; and (2) an alcoholic psychosis resulting from long continued habits of excessive drinking. The first does not excuse responsibility for a criminal act; the second may. In other words, if a person drinks intoxicating liquor and is sane both prior to drinking and after the influences of the intoxicant has worn off, but is insane by the applicable test while under the influence of the intoxicant, he comes under the first category. If he is insane whether or not he is directly under the influence of an intoxicant, even though that insanity was caused by voluntary drinking, he comes under the second category. The cases usually refer to the first category as a 'temporary' insanity and the second category as a 'permanent,' 'fixed' or 'settled' insanity. These terms may be an over simplification. What 'permanent,' 'fixed,' or 'settled' means within the frame of reference is that the insanity not only existed while a person was under the influence of intoxi-

cating spirits as an immediate result of imbibing, but existed independent of such influence, even though the insanity was caused by past imbibing. So if a person while in the throes of delirium tremens which may meet the test for insanity, commits a crime, he is not responsible for his criminal conduct, although such defect, resulting remotely from excessive drinking is only a *temporary toxic state.* It would seem that the distinction, notwithstanding the language of the cases, is not so much between temporary and permanent insanity as it is one between the direct results of drinking, which are voluntarily sought after, and its remote and undesired consequences. (emphasis added)

Moreover, the fact that settled insanity typically arises a significant time after the use of the alcohol or drugs suggests that the damage or alteration of the brain may be settled or permanent.

Furthermore, there is no requirement under Colorado's statutory insanity law that a person's insanity be permanent and not temporary. Since that which is not permanent by definition is temporary, a view that temporary insanity is not a cognizable defense is wrong. *See People v. Kelly, supra.*

Today, primarily through medication, modern medicine can alleviate the more severe and acute manifestations of many types of mental illness so that a person's inability to tell right from wrong is very often not permanent. Furthermore, one reason that criminal defendants who are acquitted of a crime because of insanity are sent to the state hospital is to receive treatment so that they may become sane and may no longer be a danger to themselves or others and thus can be returned to society.

Since the inception of the English common law system of criminal justice, insanity has been recognized as a defense to crimes. R. Perkins, *Criminal Law* (2d ed 1969). Underlying this view is the concept that a certain level of moral and rational thought is necessary to hold a person criminally responsible for a crime. Criminal law

has as a bedrock principle the notion that people who act criminally are responsible because they have the ability to act differently. *See Ryan v. People,* 60 Colo. 425, 153 P. 756 (1916).

Although the validity of this assumption is severely tested in many contexts, certainly if a person is found insane because of long-term impact on his brain from previous long-term alcohol or drug use, he should not be held criminally responsible. The legitimacy and morality of our criminal and justice system depends on the ability of a defendant to understand the nature of his actions and to conform them properly. *See Ryan v. People, supra.* For these reasons, I disagree with the dispositional opinion in its analysis of the "settled insanity" issue.

The concurring opinion suggests that, although settled insanity is a viable defense, a defendant is not entitled to an instruction which explicitly provides this legal concept to the jury as a basis for determining insanity. I reject this view that an explicit instruction on the issue is unnecessary. In my view, under the settled insanity doctrine, the long-term use of drugs or alcohol is a defense to a crime, and accordingly, a defendant is entitled to an instruction which accurately states this legal concept.

An instruction should be provided to give the jury the law as it relates to issues claimed to be true and which, if sustained by the evidence, warrant an acquittal. *See Ellis v. People,* 114 Colo. 334, 164 P.2d 733 (1945). Only by providing the jury with instructions which thoroughly state the law, can the court be assured that, in reaching its decision, the jury was not misled or otherwise failed to understand the issues. *Ellis v. People, supra.*

Furthermore, a defendant is entitled to a theory of the case instruction which states his defense to the charges. *People v. Herbison,* 761 P.2d 263 (Colo.App.1988).

Here, defendant's defense was that prior long-term use of drugs caused insanity at the time of the incident, and if the jury believed this to be true, it was, in my view, a defense to the criminal charges. *See People v. White,* 632 P.2d 609 (Colo.App.

1981). Hence, an explicit instruction on the matter was required.

In deciding a case, the jury is required to apply the facts to the law. And, the trial court has a duty to properly instruct the jury on every issue presented. *People v. Archuleta,* 180 Colo. 156, 503 P.2d 346 (1972). Failure to do so may constitute plain error. *Id.* Ingrained in the law is the right of an accused to insist that the court instruct the jury on all legal questions in order to reach a true verdict. *People v. Woods,* 179 Colo. 441, 501 P.2d 117 (1972); *People v. Alvarez,* 187 Colo. 290, 530 P.2d 506 (1975). The instructions that were given here do not recognize the settled insanity defense and, thus, do not provide an adequate legal basis for defendant's acquittal.

Such general principles are particularly pertinent here since the recent ingestion of alcohol or drugs is not a defense to a general intent crime in Colorado. Thus, the only means by which jurors can learn that there is a distinction for legal purposes between the contemporaneous use of drugs and previous long-term use of drugs is if they are informed of this distinction through a properly phrased jury instruction. *See People v. Alexander,* 663 P.2d 1024 (Colo.1983).

In summary, I disagree with the conclusion reached in the dispositional opinion that "settled insanity" is not an available defense to a criminal charge and I disagree with the concurring opinion that the absence of a specific instruction on "settled insanity" was without prejudicial impact. Hence, I would reverse the judgment of conviction and remand for new trial in which, under similar evidence, an appropriate instruction on "settled insanity" should be given.